**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. CCB-19-455** |
| | * | |
| **DELONTE WHEELER,** | * | |
| | * | |
| **Defendant** | * | |
| | * | |

**\*\*\*\*\*\***

## OPPOSITION TO DEFENDANT'S PRETRIAL RELEASE

On April 24, 2020, the Defendant Delonte Wheeler filed an Emergency Motion to Reopen Detention Hearing and Set Conditions of Release or to Issue Order for Temporary Release. ECF 22. Judge Copperthite had previously ordered Wheeler detained on December 6, 2019 after finding by clear and convincing evidence that no condition or combination of conditions of release would reasonably assure the safety of any other person and the community. ECF 12.

Wheeler's actions in this case and prior conduct while on supervised release simply make him a poor candidate for pretrial release. On April 30, 2019, police watched Wheeler and another selling narcotics, when police came in to arrest, Wheeler jumped in his vehicle (a vehicle that was registered to his current proposed third party custodian) and took police on a high speed vehicle chase, stopped and attempted to hide a firearm loaded with 12 rounds and approximately 459 grams of marijuana in a citizen's garbage can, and continued fleeing on foot until he was caught. Wheeler is only 26 years' old, but prior to this incident, Wheeler had been convicted of possession with intent to distribute on four separate occasions. While on some sort of release for each of these cases, Wheeler violated probation/parole or his supervision was closed unsatisfactorily. At the time of his current charge, he was still on probation for one of his prior convictions and parole for another, so he is currently pending a state violation of probation for which he could receive an

additional seven years imprisonment.  Further, before Wheeler was federally indicted, the state dismissed their pending charges.  When Wheeler was charged federally, the state also recharged and arrested the individual who had been selling narcotics with Wheeler on April 30, and Wheeler therefore likely knew that there was a warrant for his arrest.  Wheeler did not show up for his next meeting with his probation officer, again, likely because he knew there was a warrant for his arrest. Wheeler's probation agent talked with Wheeler's mother, who is Wheeler's current proposed third party custodian in this case, who said that she had not seen Wheeler.  During all of these prior convictions and the current charge, Wheeler's address was the same address as his proposed third party custodian's registered address – the one he likely is seeking to be released to.

The Government is sympathetic to Wheeler's request for release and that Wheeler has tested positive for COVID-19. COVID-19 is a "global pandemic that all citizens of the world are struggling to combat." *United States v. Gray*, GJH-19-407, 2020 WL 1554392, at *2 (D. Md. Apr. 1, 2020).  But Wheeler is receiving consistent medical care while in pretrial detention, as evidenced by his medical records.  Further, it cannot be ignored that his release could cause further spread of the virus.  Combine that with the facts that Pretrial Services cannot engage in traditional location monitoring due to the risk to its personnel and that the Defendant is otherwise a threat to the safety of the community, and his medical diagnosis does not support release under 18 U.S.C. §3142(g) or (i).

This Court has denied similar claims by detainees housed in facilities run by the D.C. Department of Corrections ("DOC") who have tested positive for COVID-19, *see, e.g., United States v. West*, ELH-19-0354 (D. Md.), ECF 23 (Order by Magistrate Judge Copperthite); *United States v. Ronald McCormick*, GLR-19-0318 (D. Md. Apr. 2, 2020).  In fact, this Court recently has denied over 80 claims by detainees housed in facilities run by the D.C. Department of Corrections

("DOC") and Chesapeake Detention Facility in Baltimore, Maryland. Most recently, this Court has denied the defendant's motions for release in *United States v. Lee*, ELH-19-159 (D. Md. April 24, 2020), ECF No. 97 (Order by Judge Hollander), *United States v. Williams*, GLR-19-318 (D. Md. April 24, 2020), ECF No. 345 (Order by Judge Boardman), *United States v. Remarque*, PX-19-39 (D. Md. April 27, 2020), ECF No. 100 (Order by Judge Xinis), and *United States v. Woodson*, GLR-17-658 (D. Md. April 27, 2020), ECF No. 94 (Order by Judge Sullivan). Wheeler cannot make a sufficient factual showing to merit release pending trial, and this Court should deny the motion without a hearing pursuant to Local Rule 105.6.

## PROCEDURAL BACKGROUND

On September 24, 2019, the defendant was indicted for possession of a firearm by a prohibited person in violation of 18 U.S.C. § 922(g). He had his initial appearance on December 3, 2019.

A detention hearing was held on December 6, 2019, and Judge Copperthite detained Wheeler pending trial, finding by clear and convincing evidence that no condition or combination of conditions of release would reasonably assure the safety of any other person and the community. Judge Copperthite focused on Wheeler's possession of a firearm in connection with his possession of approximately 459 grams of marijuana, that he was involved in a high-speed vehicle chase to flee from police, that he was on parole and probation at the time of the offense, and that he has four prior drug felony convictions. ECF 12.

On April 24, 2020, the defendant filed an Emergency Motion to Reopen Detention Hearing and Set Conditions of Release or to Issue Order for Temporary Release. ECF 22. Wheeler argues for release because he tested positive for COVID-19 approximately two weeks ago. As detailed below, this motion should be denied without a hearing.

3

**ARGUMENT**

Wheeler relies on the COVID-19 outbreak at the DOC facilities: D.C. Jail (where Wheeler is being held) and the Correctional Treatment Facility ("CTF").   While the Government understands that a number of DOC inmates, including Wheeler, have been diagnosed with COVID-19,[1] and that others have test results pending, well over half of the DOC defendants previously diagnosed with COVID-19 have now recovered and returned to general population. Moreover, as described further below, DOC continues to take precautionary measures to prevent further transmission of COVID-19 in both D.C. Jail and CTF and treat those detainees who have tested positive.  While suffering from COVID-19 while in pretrial detention is serious and not to be minimized, DOC is now under the oversight of the United States District Court for the District of Columbia pursuant to litigation in that court.[2]  Wheeler is receiving medical care as evidenced by his medical records.  In addition, release of someone who is currently infected with the virus would be dangerous to the community. COVID-19 is a "global pandemic that all citizens of the world are struggling to combat." *United States v. Gray*, GJH-19-407, 2020 WL 1554392, at *2 (D. Md. Apr. 1, 2020).   Under the circumstances, Wheeler's health condition simply does not merit

---

[1] On April 13, 2020, a COVID-positive CTF detainee died.  According to a press report, the detainee was diagnosed with the virus on April 7, 2020, and placed in isolation before being transferred to a hospital.  According to a public court filing, the detainee was 51 years old, "has diabetes and has multiple health issues related to that diagnosis."  The detainee had been charged with first-degree murder in D.C. Superior Court.

[2] On April 19, 2020, United States District Court Judge Kollar-Kotelly issued an opinion and order in *Banks v. Booth*, 20-cv-849 (D.D.C.) granting in part and denying in part a motion for temporary restraining order (TRO) in a lawsuit brought against D.C. Jail and the Central Treatment Facility ("CTF"), and ordering D.C. Jail and CTF to take particular remedial steps discussed further below. *See Banks*, 20-cv-849, ECF 48 and 49. Most importantly, for the purposes of the defendant's motion, Judge Kollar-Kotelly did not order the release of prisoners as a remedy under the TRO. See ECF 49, at 26 ("The Court is not ordering the release of any inmates currently detained in DOC facilities.")

release even if looked at in isolation, and it certainly does not merit release when considering it, as the Court must, alongside the seriousness of Wheeler's conduct, the weight of the evidence, Wheeler's criminal record and his consistent record of prior violations of release. The defendant's motion should be denied, without a hearing.

## I.      Legal Standard

The defendant's motion, which focuses exclusively on the COVID-19 outbreak, largely ignores the factors a court must consider in determining whether a defendant poses a danger to the community and upon which Magistrate Judge Copperthite relied in ordering detention. These factors include:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including—
>
>> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>>
>> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
>
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. . . .

18 U.S.C. § 3142(g).

Additionally, the Bail Reform Act permits the "temporary release" of a person in pretrial custody "to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i). This section is discussed further in Section IV below.

## II.    The § 3142 Factors Weigh Heavily in Favor of Detention.

In this case, an examination of the § 3142 factors demonstrates that the detention order should remain in place.

### A.    The Nature and Circumstances of the Offense

On April 30, 2019 at approximately 2:25 p.m, a detective from BPD observed and took several photos and videos of Wheeler and another individual engaging in drug trafficking activity. Specifically, Wheeler and the other individual were sitting on the steps of a vacant at 1613 Moreland Avenue. A woman with a purple shirt came up to Wheeler, Wheeler pointed at the other individual, and the other individual reached into his waistband and pulled out a plastic bag with small white objects believed to be gel caps containing narcotics. He reached in the bag, handed the woman one of the gel caps, and she handed him money. A minute or two after, two cars pulled up. Two guys came over to Wheeler and again, he pointed at the other individual. The individual got up and went to a vehicle, an Infiniti, parked to the left of the front of the steps where he was sitting. He reached down into the passenger side of the car and then made an exchange for money with each of the males, one after another. The detective observed the exchange to be of money and a small black plastic tube consistent with packaged marijuana sold in that area.

After these two male customers left, Wheeler went over to a dark blue Acura TL (registered to his mother and current proposed third party custodian) that was parked directly in

front of the Infiniti.  Wheeler opened the passenger door and was inside for a couple moments.
He went back to the steps.  Then, another male with a tan shirt and tan khakis came up to the
other individual, who reached into his front waistband and exchanged a suspected heroin gel cap
with the customer.  Right after, another man in a black shirt came up and the other individual
made an exchange at his Infiniti, with Wheeler still serving as the lookout.  The detective
captured the exchange video.  He then saw the male inspect a black plastic tube as he walked
away.

The detective called for an arrest team.  As they approached the other individual, Wheeler
got into the driver's seat of the blue Acura he went to earlier.  He drove away at an aggressive
speed.  A police helicopter (Fox Trot) was deployed to maintain sight of him.  The video footage
captures Wheeler going onto route 83 to the Northern District.  He pulled onto a street behind a
house, went into the trunk of his car, pulled out two bags (one white and one black and blue), and
put the bags in a nearby trashcan that was behind a house.  Wheeler ran down a street the next
block over, went into a white garage for a couple moments, and kept running.  Wheeler was
detained soon after.

The helicopter operator led a BPD detective to the trashcan where Wheeler had placed
the bags.  They recovered the same bags Wheeler put in the trashcan as seen on the aerial
surveillance, and they were the only bags in the trashcan.  In the bottom of the black and blue
bag was a Taurus Model Millennium Pro 9 mm semi-automatic handgun.  It was loaded with 12
nine millimeter cartridges and one round in the chamber.  On top of the firearm was 82 plastic
bags of suspected marijuana.  In the white bag was 23 plastic containers of suspected marijuana.
The combined weight of the marijuana was 459 grams of suspected marijuana.  Wheeler was
arrested.

The helicopter operator then led a BPD detective to a white garage that Wheeler had entered before he was caught.  In the garage, she found a key that opened the Acura.  The Acura is registered to Wheeler's mother with a residential address matching same address on Wheeler's MVA records.

As demonstrated here, the nature and circumstances of this offense weigh in favor of detention.  They involve not only firearm possession, but firearm possession in connection with drug trafficking and possession of a very large amount of marijuana.  They also involve not a simple arrest, but Wheeler attempting to flee from police in a vehicle and hid the evidence of his possession of the firearm and marijuana.  Not to mention that Wheeler placed a firearm and a large amount of marijuana in a stranger's trashcan right outside their home without regard to who may live there or who may have gotten ahold of that firearm loaded with one round in the chamber.

### B.      Weight of the Evidence

The evidence in this case is strong.  A detective watched Wheeler engage in narcotics trafficking activity (albeit he appeared to be the lookout and it was another individual he was with that conducted the hand-to-hand transactions). The aerial surveillance of Wheeler is extremely clear – it shows Wheeler driving on the highway at a high rate of speed, exiting and stopping on a residential street, removing two bags from the trunk of his vehicle and placing those bags in a stranger's trashcan, and then continuing to run on foot until he is caught by police.  Body worn camera footage shows the recovering of those bags from the trash and that the contents were a loaded firearm and a large amount of packaged marijuana.

### C.        History and Characteristics of the Person

While the Government appreciates hat Wheeler does not have a prior history of violent convictions, he does have a history of four prior drug distribution convictions, which are concerning given the circumstances that he was caught in this case with a firearm sitting on top of a clear distribution amount of marijuana. He also has a history of consistent failure to abide by probation/parole conditions, which is also very concerning.  Pretrial Services has a limited ability to supervise and monitor individuals on release at this time and Wheeler's proposed third party custodian is his mother, whose vehicle he used to store firearms and distribution amount of marijuana and to engage in a high speed chase.  And the likely proposed residence is his mother's residence where he lived during each of his prior arrest, during the time of his probation/parole violations, and at the time of the current offense.

Wheeler is only 26 years' old, but prior to this incident, Wheeler had been convicted of possession with intent to distribute on four separate occasions.  Two in 2011 at age 18, one in 2012 at age 19, and one in 2018 at age 25.  Coupled those with this case at age 26, and there is a consistent pattern of drug distribution that has now escalated to involving firearms.

In addition, Wheeler has never made it to the end of his parole/probation for a conviction without a violation or it being closed unsatisfactorily.  For his first conviction, he was found guilty of a violation of probation in 2018 and given a second chance at probation.  He was still serving that probation at the time he committed the instance offense and is now facing seven years imprisonment in the state for that violation.  For the second and third convictions, his mandatory release was closed unsatisfactorily.  For the fourth conviction, he was on parole at the time of the instant offense.

Further relating to his likely inability to abide by release conditions, before Wheeler was federally indicted, the state dismissed their pending charges.   When Wheeler was charged federally, the state also recharged and arrested the individual who had been selling narcotics with Wheeler on April 30, and Wheeler therefore likely knew that there was a warrant for his arrest. Wheeler did not show up for his next meeting with his probation officer, again, likely because he knew there was a warrant for his arrest.  Wheeler's probation agent talked with Wheeler's mother, who is Wheeler's current proposed third party custodian in this case, who said that she had not seen Wheeler.

### D.        The Nature and Seriousness of the Danger to the Community in the Event of the Defendant's Release

Wheeler has proven to be a drug trafficker who has escalated to using firearms during this activity.  It is undeniable that drug dealing is a "dangerous transactional business" and that a drug dealer may possess firearms to defend his drugs, his drug proceeds, or his person. *United States v. Moore*, 769 F.3d 264, 270 (4th Cir. 2014).  Given this inherent danger, the defendant, a drug dealer with a firearm, should not be released pending trial.  Not to mention that firearms-related act of violence in Maryland continue to soar.  According to the *Baltimore Sun*, in the year 2019, 309 of the total 348 homicides in Baltimore were from gunfire.[3]

Wheeler has also proven to be a serious danger to the community because he has never been able to respect conditions of his release from prison.  While Wheeler claims that he was not under the strict conditions he proposes in this case in the past, this simply is not persuasive.  Pretrial is not going to be able to do traditional location monitoring due to COVID-19 and it again will be largely up to Wheeler to abide by the conditions.  Wheeler has proven he cannot be trusted to do

---

[3] Data from *Baltimore Homicides*, https://homicides.news.baltimoresun.com/?range=2019&cause=all

so time and time again.  Nor can his mother be trusted to be a watchful eye.  He lived at her residence during all of his prior offense and violations of release.  When he did not show up his scheduled meeting with his probation officer just in 2019, his mother said she did not know where he was despite that he lived with her.  Under these circumstances, Wheeler's inability to be dissuaded from criminal activity while being on forms of release and inability to be appropriately monitored here, creates an undeniably high risk that he will endanger the community if he is released pending trial.

### III.  D.C. Department of Corrections Has Established Procedures with Respect to the COVID-19 Outbreak that Are Now Being Overseen by the United States District Court for the District of Columbia.

Wheeler's motion focuses almost exclusively on the health risks posed by COVID-19 and ignores the other § 3142 factors the Court must consider in determining whether a defendant poses a danger to the community and a flight risk.  To be sure, the Bail Reform Act instructs courts to consider the "physical and mental condition" of the defendant as one of the factors in its analysis. 18 U.S.C. § 3142(g)(3)(A).  Notwithstanding the COVID-19 outbreak, that factor does not weigh heavily, if at all, in favor of the defendant's release.  Wheeler is receiving medical treatment for COVID-19 in the D.C. Jail. As discussed below, however, DOC, which oversees the D.C. Jail and CTF, has implemented measures to treat those who have become infected and implemented precautionary measures to mitigate the spread of further infection, continues to evolve its policies and procedures to address the unprecedented COVID-19 pandemic, and is being closely supervised in its ongoing efforts as part of the *Banks* litigation in the United States District Court for the District of Columbia.

A.     **DOC Has Instituted Precautionary Measures to Avoid Further Transmission of COVID-19 and Ensure Adequate Medical Care for Those Infected.**

DOC has implemented a number of precautionary measures based on guidance from the D.C. Department of Health and the Centers for Disease Control ("CDC") to mitigate the risks associated with COVID-19, including restrictions on visitation to the facility, screening and quarantine of inmates, increased provision of masks and other personal protective equipment ("PPE") to staff and inmates, continued education of staff and inmates about the spread of COVID-19 and ways to combat it, cancellation of group activities, and restrictions on out-of-cell time. As additional measures are implemented, DOC continues to alert the public. *See* https://doc.dc.gov/page/coronavirus-prevention (last accessed April 20, 2020).[4]

The Government acknowledges that Judge Kollar-Kotelly found that many of DOC's measures prescribed by policy have not been properly implemented (at least as of the time independent inspectors visited the facility on three occasions between April 10 and April 12), further measures are needed, and further education of staff and inmates regarding the measures that exist is necessary. *See generally*, *Banks*, Mem. Op., ECF 49. Notably, however, Judge Kollar-Kotelly declined to grant the requested injunctive relief of releasing prisoners. *See id.* at 26.

As Judge Kollar-Kotelly recognized, "COVID-19 poses an unprecedented challenge and the precautionary measures taken by [DOC] are rapidly evolving." *Banks*, Mem. Op., ECF 49, at 16; *see also id.* at 15 (recognizing that DOC's "response to this sudden and unprecedented pandemic is ongoing"). With the recognition that DOC's response continues to evolve, Judge

---

[4] The DOC webpage is updated regularly with announcements, policy descriptions, and answers to frequently asked questions.

Kollar-Kotelly issued an extensive order to remediate the deficiencies in DOC's implementation of its policies, including:

- ensuring proper triage process for sick call requests;
- ensuring medical staff are promptly informed of inmates who present with symptoms of COVID-19;
- providing better documentation of sick calls and the outcomes of same;
- ensuring proper monitoring of cell restrictions;
- ensuring appropriate housing for inmates in quarantine;
- consulting with public health professionals regarding strategies that can be implemented to strengthen COVID-19 related education;
- conducting additional staff training on use of thermometers;
- providing consistent and reliable access to legal calls;
- ensuring proper social distancing;
- ensuring proper use and communication to staff regarding use of PPE;
- strengthening the environmental health and safety program;
- assessing whether any additional security staff are needed to provide appropriate supervision for social distancing; and
- ensuring that all inmates, including those on isolation, have access to confidential, unmonitored legal calls of a duration sufficient to discuss legal matters.[5]

On April 17, 2020, DOC Director Quincy L. Booth also issued a memorandum to all employees and contractors entitled "Reminders and Updated COVID-19 Policies and Procedures" (attached here as Exhibit A). *See Banks*, Report Submitted by *Amicus Curiae* Pursuant to April 9, 2020 Consent Order, ECF 47, Ex. 11. Director Booth's memorandum, which directly addresses many of the concerns raised by the independent inspectors as part of the *Banks* litigation, both reminds staff of existing procedures and provides several updated procedures, including the following:

- **Social Distancing:** Correctional officers must enforce social distancing at all times. There shall be multiple daily announcements over the public address system reminding staff and resident of the need for social distancing. Strict limits also are placed on the number of people who can be out of their cells at one time (generally no more than six). Group activities shall continue to be suspended during the emergency period.

---

[5] *See Banks*, Order, ECF 48; *see also* Mem. Op., ECF 49, at 27-31.

- **Residential Out of Cell Time:**  Inmates are restricted to one hour out of their cells each day, and there will be PA announcements reminding inmates of this rule.

- **Personal Protective Equipment:**  DOC shall conduct refresher courses on the proper use of PPE for staff during roll call on each shift and such courses shall be documented.  DOC's medical staff and sick call staff shall visit DOC housing units to refresh staff and residents on PPE use, COVID prevention, and how to submit sick call slips for medical units, and such refreshers shall be documented.

- **Isolation Units:**  All residents in isolation shall be allowed to shower once per day, shall be allowed 30-minute legal calls per day on an unmonitored "rolling phone" that will be transported to the inmate's cell, and shall be provided tablets with entertainment and education content, as well as activity packets.

- **Unit Common Area and Cell Cleaning:**  At the beginning of each shift, correctional officers shall document the amount of cleaning supplies available and report any shortages, provide cleaning products on towels or paper towels for inmates to clean cells, verify and document that common areas are cleaned, and post listings of cleaning products available to residents in each housing unit.

- **Linen and Laundry Exchanges:**  Each week, DOC shall provide residents with fresh clothing, undergarments, and linens, and collect used items.

- **Contractor and Staff Screening and Hygiene:**  All staff and contractors entering DOC facilities will continue to undergo a COVID-19 screening, including temperature checks and answering questions related to COVID-19 symptoms.  Staff conducting the screenings will be re-trained in the use of thermometers.  Following the screening, staff shall properly wash their hands before entering the facility.  Non-essential visitors will be excluded from the facility.  Any staff that have been in sustained, close contact with someone who has tested positive will be informed.

- **Access to Legal Calls:**  All residents shall be allowed 30-minute legal calls daily.  DOC staff will also cooperate to facilitate incoming calls from attorneys.

- **Medical Care:**  If DOC staff observe an inmate exhibiting symptoms of COVID-19, staff shall direct that person to medical staff.

- **Additional Measures:**  DOC is also working to make better use of single cells where possible, is increasing staff through the Medical Reserve Corps to assist with provision of medical care and temperature checks, is trying to obtain additional tablets for residents to use during the duration of the emergency period, is increasing monitoring of inmates placed on quarantine, and will request deployment of mobile COVID-19 testing within DOC facilities when it becomes available.

Wheeler's motion simply recounts the deficiencies identified by Judge Kollar-Kotelly that DOC has been ordered to remediate under the close supervision of the United States District Court for the District of Columbia.  Yet, as Judge Hollander recognized after Judge Kollar-Kotelly's opinion "DOC has implemented substantial measures at CTF to protect detainees from COVID-19 and to treat those who are infected."  *Lee*, ELH-19-159, ECF No. 97, at 14 (listing modified procedures implemented by DOC).  Furthermore, "in this rapidly evolving situation, new information concerning the virus emerges at break-neck pace, and DOC has repeatedly revised its procedures.  Now, DOC must do so again, in light of Judge Kollar-Kotelly's ruling." *Id.* at 14.

Moreover, Judge Kollar-Kotelly's Order specifically denied the *Banks* plaintiffs' request for the release of prisoners as not called for by the record.  *See, e.g., Banks*, ECF 49 ("The Court is not ordering the release of any inmates currently detained in DOC facilities.").  The *Banks* Order instead imposed specific remedies for the specific deficiencies noted in that case.  As Judge Xinis recently noted, "although the D.C. District Court indeed found at this stage a likelihood that the *Banks* plaintiffs may establish Eighth and Fifth Amendment violations at D.C. Jail, that court also addressed the present harms through injunctive relief which does *not* include release or transfer of the detainees.  Even if this Court were to accord the D.C. decision the weight that [the defendant] urges, so too would it credit that release is simply not compelled as a result." *Remarque*, PX-19-39, at 6.  *See also United States v. Williams*, PWG-13-544 (D. Md.), ECF No. 94 (Order by Magistrate Judge Day) (acknowledging that DOC has taken significant measures to stem the tide of the pandemic, and recognizing that "[s]hould the unfortunate event occur, the correctional authorities have in place a plan of action that should not be summarily embraced or discarded. Nor does it follow that a presumption of release materializes without more details about the impact upon [the defendant] directly."); *United States v. Cleckley*, TDC-18-344 (D. Md.), ECF No. 485

(Order by Judge Chuang) ("If the conditions prove to be unacceptable, the solution for [the defendant] will be for the Court to require improvements to the conditions or to have him moved to another detention facility, not to order [the defendant] to be released into the community.")

With respect to the DOC detainees who have tested positive, such as Wheeler, DOC's medical team and Unity Health Care continue to work with the D.C. Department of Health ("DOH") on contact tracing and to protect the health and wellbeing of other DOC detainees.  As part of these measures, DOC has implemented various levels of quarantine, depending on the inmates' symptoms and potential contact with infected individuals.  Moreover, while the defendant points to the numbers of detainees who have tested positive, and the rate at which the numbers have increased, as Magistrate Judge Day has recognized, "medical experts have universally and correctly predicted that the raw numbers of those who would be infected would multiply.  This fact has borne true no matter when in the country the virus has appeared. . . . Merely casting numbers about the rising infection rate, without more, is not helpful." *United States v.* Ray, TDC-19-215 (D. Md.), ECF No. 76, at 4 (Order by Magistrate Judge Day). Moreover, the defendant's motion neglects to mention that, as of April 20, 2020, at least 50 DOC detainees who previously tested positive for COVID-19 have since recovered and are no longer in isolation.

Further, while Wheeler argues Judge Kollar-Kotelly found that inmates in isolation were denied showers, laundry services, and access to confidential legal calls, the DOC's response to this unprecedented pandemic is rapidly evolving as it endeavors to implement measures recommended by the CDC and D.C. Department of Health, as well as the series of measures ordered by Judge Kollar-Kotelly.  As explained above, DOC now has directives to allow inmates in isolation to shower once per day; to document the amount of cleaning supplies available to clean to cells; to provide residents with fresh clothing, undergarments, and linens, and collect used items; and to

allow legal calls.   COVID-19 is not a problem that afflicts DOC facilities alone, and DOC continues to improve its response to the outbreak in its facilities.   These remedies are the appropriate way to handle Wheeler's complaints, not release of a person who poses a danger to the community.  Similarly, Wheeler complains that his medical records reflect a diagnosis of Type-II diabetes when he has Type-I diabetes.  This certainly needs to be changed and the Government will help in any way it can have the medical records reflect that change, but it does not warrant release.  And although Wheeler complains that the facility does not have the capacity to treat him properly, his records indicate that he is receiving care on a regular basis.

DOC's response to this unprecedented pandemic is rapidly evolving as it endeavors to implement measures recommended by the CDC and D.C. Department of Health, as well as the series of measures ordered by Judge Kollar-Kotelly.  The defendant has not shown that the care with regard to COVID-19 within DOC facilities merits release when weighed against the other Bail Reform Act factors this Court must take into account and the continued corrective measures being implemented by DOC.  *See Remarque,* PX-19-39, ECF No. 100, at 6-7 ("Finally, this decision in no way minimizes the unprecedented threat that COVID-19 has befallen on our community, country, and world, including places of confinement. For some individuals, the virus visits profound suffering, illness, and even death. This cold reality, however, does not permit the Court to cast the Bail Reform Act aside, but rather to follow it with special care to the individualized circumstances presented. When doing so here, the balance simply does not tilt in favor of Remarque's release."); *Lee*, ELH-19-159, ECF No. 97, at 13-14; *Gray*, GJH-19-0407, ECF 120 ("COVID-19 is not a virus that has specifically attacked the D.C. Jail but, rather, a global pandemic that all citizens of the world are struggling to combat.  There is no reason for the Court to believe that the jail is not taking reasonable precautions to prevent spread within the facility nor

is there reason to believe that [the defendant] would not be provided with appropriate medical care if he were unfortunate enough to join the hundreds of thousands of people who have been inflicted with the virus.").

### B.    The Defendant's Individual Circumstances Do Not Merit Release.

That Wheeler suffers from asthma, diabetes, and is positive for COVID-19 does not change the analysis. This Court has recently denied a number of motions by detainees claiming that they had medical conditions that made them uniquely vulnerable to COVID-19. *See, e.g.*, *United States v. Martin*, PWG-19-140 (D. Md.), ECF No. 209 (Order by Judge Grimm), ECF No. 209 (denying motion for pretrial release by detainee suffering from "diabetes, high blood pressure, asthma, and pain"); *United States v. Bilbrough*, TDC-20-33 (D. Md.), ECF No. 76 (Order by Magistrate Judge Sullivan), ECF No. 76 (denying a similar motion by a defendant suffering from diabetes, even though "experts on COVID-19 have stated that individuals with diabetes are at a higher risk of experiencing more serious complications if infected with the virus"), *aff'd* ECF No. 92 (Order by Judge Chuang); *United States v. Parker*, TDC-18-344 (D. Md.), ECF No. 478 (Order by Magistrate Judge Simms), ECF No. 478 (denying motion for pretrial release by a detainee who "suffered an aneurysm (in the past), had prostate cancer (now in remission), and presently suffers from diabetes, the latter two conditions having compromised his immune system and/or put him at a higher risk of an inability to fight infection"); *United States v. Jefferson*, CCB-19-487 (D. Md.), ECF No. 25 (Order by Judge Blake), ECF No. 25 (asthma); *United States v. Williams*, PWG-13-544 (D. Md.), ECF No. 94 (Order by Magistrate Judge Day), ECF No. 94 (67-year-old defendant); *United States v. Gray*, GJH-19-407, ECF No. 120 (Order by Judge Hazel), ECF No. 120 ("open heart surgery as a child, requires regular EKGs, and continues to experience a diminished immune system, heart flutters, and shortness of breath"); *United States v. Tucker*, GJH-19-555 (D. Md.), ECF No. 26

(Order by Magistrate Judge Day), ECF No. 26 ("a respiratory condition (severe asthma), high blood pressure, and high cholesterol"; "Defendant at no point provides medical records which substantiate his claims"); *United States v. Christian*, DKC-20-19 (D. Md.), ECF No. 23 (Order by Magistrate Judge Coulson), ECF No. 23 (asthma); *United States v. Pate*, PWG-17-236 (D. Md.), ECF No. 53 (asthma); *United States v. Attia*, PWG-19-193 (D. Md.) (Order by Magistrate Judge DiGirolamo), ECF No. 53 (asthma, migraines); *United States v. Bland*, PWG-15-141 (D. Md.), ECF No. 95 (Order by Magistrate Judge Day), ECF No. 95 (asthma, seizures).

While the COVID-19 virus is new, health claims by detainees are not. Courts have generally recognized that "it is a rare case in which health conditions present an 'exceptional reason'" to allow for release where otherwise detention would be warranted. *United States v. Wages*, 271 Fed. App'x 726, 728 (10th Cir. 2008). These cases recognize that reasonably necessary treatments are available in prison, and often times a prison setting will provide care superior to what a defendant can obtain on the outside. *See United States v. Rodriguez*, 50 F. Supp. 2d 717, 722 (N.D. Ohio 1999). In this case, the defendant simply has not made a factual record that his medical needs will not be met while detained. Indeed, Wheeler's medical records show he is being treated, receiving medication, and his condition is improving. While the Government completely understands that it is more difficult and less comfortable to be ill while in prison, granting a defendant's motion for release based on the general threat of harm posed by COVID-19 flies in the face of the defendant-specific analysis required by 18 U.S.C. § 3142(f).

Further, Wheeler's diagnosis of COVID-19 does not weight in favor of release. As Judge Copperthite explained in denying release to another detainee who had tested positive for COVID-19, he "is properly isolated and is under the medical supervision of CTF medical staff." *United States v. Terrell West*, ELH-19-364, ECF 23 at 3 (D. Md. Apr, 2, 2020) (Copperthite, J.). "[A]ny

person infected with COVID-19 poses an acute threat to society." *United States v. Terrell West*, ELH-19-364, ECF 33 at 8 (D. Md. Apr.10, 2020) (Hollander, J.); *see also United States v. Ronald McCormick*, GLR-19-0318 (D. Md. Apr. 2, 2020) (Russell, J.) (finding that because the defendant tested positive for COVID-19, "release of the Defendant, given the rapid spread of the virus, in itself poses a danger to the community").  Tellingly, Maryland Governor Larry Hogan recently issued an order authorizing the release of certain inmates in the custody of Maryland's Division of Corrections who were close to completing their sentence and specifically ordered that inmates displaying COVID-19 symptoms are ineligible for early mandatory supervision, home detention, or accelerated parole.[6]  While Wheeler claims he is a risk to other inmates and staff because he has the virus, removing Wheeler from isolation and placing him in home confinement "would risk transmittal of the virus to the CTF staff involved in his transfer, his third-party custodian, and anyone who visits him while he convalesces."  *See West*, ELH-19-364, ECF 33 at 8 (D. Md. Apr.10, 2020) (explaining why releasing a COVID-19 positive detainee could facilitate the spread of the virus).

Moreover, Wheeler's multiple violations while under court supervision in the past demonstrate a distinct and significant risk to the community because he could spread the virus if he failed to abide by release conditions this time.  And he simply is not a good candidate for community supervision even after he recovers. Just as he could not be trusted to comply with the conditions of his supervision in prior cases, he cannot be trusted to adhere to the social distancing guidelines that are so necessary to protect the health of the community.  *See, e.g., United States v. McKenzie*, 18 Cr. 834 (PAE), ECF No. 457 (S.D.N.Y. April 6, 2020) (defendant who had been granted pre-sentence release based on the risk of becoming ill from COVID-19 immediately

---

[6] Order of the Governor of the State of Maryland No. 20-04-18-01, *Implementing Alternative Correctional Detention and Supervision*, at 4, https://governor.maryland.gov/wp-content/uploads/2020/04/Prisoner-Release-4.18.20.pdf

violated his release conditions and risked the health of his community by hosting a welcome-home party with numerous others).

### C.   Traditional Location Monitoring Is No Longer An Option for Pretrial Services.

Pretrial Services now has diminished ability to monitor defendants on home detention. Due to COVID-19, the Court has suspended traditional electronic home monitoring that relies on radio frequency or GPS to provide real-time information about a defendant's whereabouts. Although other forms of home detention are still available, "none provides 24/7 monitoring and notification." *Gibson-Bey*, RDB-19-563 (D. Md.), ECF 2, at 3 n.2. Accordingly, Pretrial Services' ability to ensure that defendants do not become a flight risk or pose a danger to the community has been significantly curtailed.

Furthermore, electronic monitoring simply is not a replacement for incarceration, as home monitoring does not prevent others from coming to the defendant's residence, which increases the risk of the defendant violating the law, as well as his exposure to COVID-19. *See, e.g., United States v. McKenzie*, 18 Cr. 834 (PAE), ECF No. 457 (S.D.N.Y. April 6, 2020) (defendant who had been granted pre-sentence release based on the risk of becoming ill from COVID-19 immediately violated his release conditions and risked the health of his community by hosting a welcome-home party with numerous others).

### IV.   The Defendant Has Not Met His Burden of Showing that Temporary Release is "Necessary" Under 18 U.S.C. § 3142(i)

The Court should also deny the defendant's request for temporary release under 18 U.S.C. § 3142(i). Section § 3142(i) of the Bail Reform Act permits the "temporary release" of a pretrial detainee "in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's

defense or for another compelling reason." The defendant bears the burden of showing that temporary release is "necessary" under this section. *See United States v. Dupree*, 833 F. Supp. 2d 241 (E.D.N.Y. 2011); *United States v. Stephens*, No. 15-cr-95, 2020 WL 1295155, at *2 (S.D.N.Y. Mar. 19, 2020). Moreover, requests for temporary release cannot "be analyzed in a vacuum"; rather, the court must "balance the reasons advanced for such release against the risks that were previously identified and resulted in an order of detention." *United States v. Cox*, No. 2:19-cr-00271, 2020 WL 1491180, at *2 (D. Nev. Mar. 27, 2020); *see also United States v. Eley*, No. 20 CR 78-3, 2020 WL 1689773, at *1 (S.D.N.Y. Apr. 7, 2020) (compelling reasons under § 3142(i) must be balanced "against the risks that were previously identified and resulted in an order of detention") (internal quotation marks and citation omitted).

As Judge Hollander recently noted in *United States v. Xavier Lee*. ELH-19-159, ECF 97 at 8 (D. Md. Apr. 24, 2020), "courts have invoked § 3142(i) parsimoniously and only for truly extraordinary circumstances. *Compare United States v. Scarpa*, 815 F. Supp. 88, 89 (E.D.N.Y. 1993) (granting temporary release where the defendant had sustained a gunshot wound to the head and would "shortly die" from AIDS), *with United States v. Rebollo-Andino*, 312 F. App'x 346, 348 (1st Cir. 2009) (denying temporary release where the defendant disclosed that he had a hernia but did not explain why correctional authorities could not capably provide treatment)." In the context of COVID-19, the Fourth Circuit explained that 18 U.S.C. § 3142(i) requires considering "the severity of the risk that the COVID-19 virus poses to the defendant, given his existing medical conditions and the current COVID-19 situation at the facility where he is being held, and whether that risk, balanced against the other Bail Reform factors, rises to the level of a 'compelling reason'

for temporary release..." *United States v. Creek*, CCB-19-36, App. No. 20-4251, ECF 18 at *1 (4th Cir. Apr. 15, 2020).

Judges in this district and other districts have considered and denied requests for temporary release under § 3142(i) based on the COVID-19 pandemic. *See United States v. Brown*, No. CCB-19-576, 2020 WL 1554059 (D. Md. Apr. 1, 2020) (Order by Judge Copperthite) (finding that § 3142(i) "relates to temporary release to the U.S. Marshals or other authority for situations such as funeral attendance or other limited specific reasons, not the pandemic outbreak of COVID-19"); *United States v. Moran*, No. SAG-19-0585, 2020 WL 1663366 (D. Md. Apr. 3, 2020) (Order by Judge Copperthite) ("It is this Court's position that 3142(i) is reserved for very limited purposes such as funeral attendance or other law enforcement (USMS) supervised activity, not release during a pandemic."); *Parker*, No. TDC-18-0344 (denying release under § 3142(i) based on risk of contracting COVID-19, even though defendant had diabetes and other serious health conditions); *Cleckley*, TDC-18-0344 (denying release under § 3142(i), notwithstanding COVID-19 outbreak at CTF where defendant was housed, where defendant had pled guilty to gun and drug offenses and did not have any "high-risk health conditions"); *Remarque*, PX-19-39, at 6 (denying release of recovered COVID-19 positive detainee); *United States v. Clark*, No. 19-40068, 2020 WL 1446895, at *3 (D. Kan. Mar. 25, 2020) (denying release based on individualized assessment of § 3142(g) risk factors, even though defendant had diabetes, and finding that "a defendant should not be entitled to temporary release under § 3142(i) based solely on" COVID-19 concerns); *United States v. Cox*, No. 2:19-cr-00271, 2020 WL 1491180, at *2 (D. Nev. Mar. 27, 2020) (rejecting request for temporary release under § 3142(i), finding that danger to the community outweighed risk presented by COVID-19 for 60-year-old defendant with diabetes, and jail's temporary suspension of in-person legal visits did not render release necessary for preparation of the defense).

Recently, in *United States v. Green*, CCB-19-0539 (D. Md. Apr. 15, 2020) (Order by Judge

Coulson), the court addressed a § 3142(i) temporary-release request by an inmate at CTF who had

"underlying health conditions of asthma, high blood pressure and chronic obstructive pulmonary

disease[,] putting him at particular risk for complications should he contract [COVID-19]." *Id.* at

2. The court found, first, that temporary release was not necessary for preparation of the defense,

as "the restrictions imposed at CTF are reasonable, necessary, and temporary," and "all cases have

been postponed by this Court's most recent Standing Order through June 5, 2020." *Id.* at 5.

Turning to the question whether there was "other compelling need" for release, the court focused

on four factors: "(1) [t]he original grounds for detention; (2) the specificity of a defendant's

COVID-19 concerns; (3) the extent the proposed release plan is designed to mitigate or exacerbate

other COVID-19 risks to the defendant; and, (4) the likelihood that a defendant's release would

increase the COVID-19 risks to others." *Id.* at 5–6 (citing *United States v. Clark*, 2020 WL

1446895 (D. Kan. Mar. 25, 2020)). The court found that notwithstanding the defendant's

underlying health conditions, the other factors weighed against release. First, the original reasons

for detention were "strongly in the Government's favor." Second, the defendant's poor

performance on community supervision in the past raised concerns "not only that he would comply

with release conditions, but also that he would comply with advice from public officials and public

health experts regarding COVID-19 precautionary measures." *Id.* at 6. Finally, the court found

that the family members whom the defendant proposed as third-party custodians were not

"appropriate person[s]" within the meaning of § 3142(i) who could ensure the defendant's

compliance with conditions of release. *Id.* at 6–7.

Then, in *United States v. Xavier Lee*. ELH-19-159 ECF 97 (D. Md. Apr. 24, 2020), Judge

Hollander denied the defendant, who suffers from obesity, high blood pressure, and depression,

his request for temporary release under § 3142(i).  While acknowledging the risk of contracting COVID-19 while on pretrial detention and specifically in a DOC facility, Judge Hollander pointed to Judge Kollar-Kotelly's order in *Banks* that DOC take further action to protect inmates such as triaging sick call requests, implementing social distancing policies, and ensuring that the staff have protective equipment.  Judge Hollander found that the defendant's medical condition and the circumstances as CTF could not create a compelling reasons for temporary release because they did not outweigh the serious nature of the defendant's conduct (using interstate facilities to promote prostitution), the weight of the evidence, and the defendant's prior violations of supervised release.

Wheeler's asthma, diabetes, and positive test for COVID-19 also do not create a compelling reason for temporary release.  Wheeler's medical records show he is receiving medication and medical monitoring.  It appears that Wheeler's condition is improving.  DOC is under order to implement appropriate measures as outlined above, for example, to immediately respond to sick call requests, to enforce social distancing policies, and to ensure that the staff have protective equipment.  Wheeler's medical records suggests that he is regularly being seen by medical professionals.  Removing him from D.C. and taking to a home in Baltimore would expose others, including his proposed third party custodian and individuals living with her to potentially contracting COVID-19.   Under these circumstances, Wheeler's physical condition does not support finding that there is a compelling reason for temporary release when weighed against the serious nature of his conduct in this case, prior convictions, and a consistent failure to abide by release conditions as fully explained above.

## **CONCLUSION**

For the foregoing reasons, the Court should deny Wheeler's motion to reopen a detention.

Respectfully submitted,

Robert K. Hur
United States Attorney

_Lindsey McCulley_
_____

Lindsey N. McCulley
Assistant United States Attorney